UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
ROBERT YOUNG, STEVEN SCHEIN,
MICHAEL O'LEARY, RICHARD FOGELSON,
GARY FERRUCCI, and JOHN BIRBIGLIA,
*on behalf of themselves and all other similarly
situated*,                                                              **MEMORANDUM & ORDER**
                                Plaintiffs,                        09 CV 3830(DRH)(WDW)

     -against-

COUNTY OF NASSAU, PATROLMENS'
BENEVOLENT ASSOCIATION,
SUPERIOR OFFICERS' ASSOCIATION,
and DETECTIVES' ASSOCIATION, INC.,

                              Defendants
----------------------------------------------------------X

**APPEARANCES:**

**Valli Kane &Vagnini, LLP**
Attorneys for Plaintiffs
600 Old Country Road, Suite 519
Garden City, NY 11530
By:     Robert J. Valli, Jr, Esq.

**Lamb & Barnosky, LLP**
Attorneys for Defendant County of Nassau
534 Broadhollow Road
Melville, New York 11747
By:     Matthew J. Mehnert

**Greenberg Burzichelli Greenberg P.C.**
Attorneys for Defendant Patrolmens' Benevolent Assoc.
300 Marcus Avenue, Suite 1W7
Lake Success, NY 11042
By:     Seth H. Greenberg, Esq.
            Linda N. Keller, Esq.

**Certilman, Balin, Adler & Hyman, LLP**
Attorneys for Defendants Superior Officers' Assoc. and Detectives' Assoc., Inc.
90 Merrick Avenue, 9th Fl.
East Meadow, NY 11554

By:   Paul S. Linzer, Esq.
      Stephen Mc Quade, Esq.

**HURLEY, Senior District Judge:**

Before the Court is plaintiffs' two-part motion. The first part seeks reconsideration of the September 21, 2011 Memorandum and Order ("M&O"), which granted defendants' motions to dismiss the amended complaint. The second part moves in the alternative for leave to amend the complaint for a second time. For the reasons that follow, plaintiffs' motion is denied in its entirety and this case is dismissed with prejudice.

I.   **PLAINTIFFS' MOTION FOR RECONSIDERATION**

   a.   **Plaintiffs' Allegations and the Court's Order of Dismissal**

A full recitation of the facts of this case can be found in the M&O that plaintiffs now ask the Court to reconsider. *See Young v. County of Nassau*, No. 09 CV 3830, 2011 U.S. Dist. LEXIS 106316 (E.D.N.Y. Sept. 21, 2011). A familiarity with this action is therefore assumed; only those facts necessary to address the present motion will be recounted below.

By Order dated September 21, 2011, the Court dismissed plaintiffs' federal claims under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and declined to exercise supplemental jurisdiction over the remaining state law claims. Plaintiffs' claims pertain to a policy implemented through the collective bargaining process[1] that effectively capped the amount of accrued and unused leave time that is paid out to an employee at retirement (referred to hereinafter as "termination pay"). Under the policy, regardless of the amount of unused leave that an employee had banked by the time they retired, one's termination pay at the time of

---

[1] As discussed in the M&O, the policy was enacted through interest arbitration awards pursuant to Article 14 of the New York Civil Service Law (a/k/a the Taylor Law). (M&O at 7-8.)

2

retirement could not exceed two times his or her final annual salary. The new policy, however, did not go into effect on July 1, 2009, allowing anyone who was eligible to retire before that date to do so and avoid the imposition of the cap on their termination pay. Of course, those who did not, or could not, retire by that date were necessarily subject to the termination pay cap when they later retired. Plaintiffs allege that this policy amounts to age discrimination because it forces the older workers, *i.e.* those then eligible for retirement, to choose between (1) retiring prior to July 1, 2009 and receiving their full termination pay, or (2) staying on the job and accepting a cap on the amount of their termination pay when they later retire. By contrast, the younger workers, *i.e.* those not-then eligible for retirement, would not have to face this same dilemma because they could not retire in any event before the policy went into effect.

Plaintiffs drew a line between these older and younger workers at age 40, though the amended complaint failed to provide any explanation as why they delineated between the two groups at that particular age.[2] One possibility raised by the Court was that the language of the policy itself excluded those 40 and under. (*See* M&O at 9.) However, an examination of the policy[3] revealed that that was not the case. Based on the facts alleged, and documents incorporated by reference in the amended complaint, the Court determined that age 41 must represent the minimum age at which an employee becomes eligible for retirement.[4]

The Court then concluded that the policy did not violate the ADEA. The following excerpts from the M&O provide the basis for this holding:

---

[2] Specifically, the complaint alleged, without any further clarification, that the policy "affects no employee under the age of 41 years old." (Am. Compl. ¶ 33.)

[3] See Discussion section I(b)-(c) of the M&O for an explanation of which documents the Court considered in deciding the motion and why it was permissible to consider each.

[4] Although the Court was able to infer this fact from the pleadings, there was no indication in the pleadings whether age, alone or in conjunction with other factors, was actually a criteria for retirement eligibility. (*See* discussion in M&O at 11, n.5.)

3

> [T]he dissimilar effect of the policy between the two age groups is not the result of an explicit exclusion in the policy based on age, but the artifact of a separate eligibility criteria for retirement that somehow sets 41 as the minimum age at which an employee becomes eligible to retire. This fact reveals a critical mischaracterization by plaintiffs in their pleading. It is not that the "[c]ap affects *no* employee under the age of 41." (Compl. ¶ 31(emphasis added).) Rather, it is that the cap affects every employee under the age of 41. More accurately, the cap affects every employee who does not retire before July 1, 2009, regardless of age. The cap reduces the termination pay of every employee moving forward after the effective date. The only difference between the older set and the younger set is that the older set has the option to retire before July 1, 2009 and avoid the cap. The younger set does not have this option, however; they have no choice but to accept the cap on their termination pay when they retire. Those over 40 who choose not to retire before July 1, 2009 will, of course, also have their termination pay capped, but this is imposed not because of their age, but because of their choice not to retire. The result is that the older workers are actually at an advantage over their younger counterparts, not a disadvantage. . . .
>
> . . .
>
> . . . [B]ecause the policy takes effect for everyone on the same date, July 1, 2009, rather than on a separate date for each person based on his or her birthday, the trigger is not one's age, but the passing of July 1, 2009. Second, because the policy takes effect on that date, and applies uniformly to all employees moving forward, the advantage conferred on the younger workers in *Abrahamson* [*v. The Bd. of Educ. of The Wappingers Falls Cent. Sch. Dist.*, 374 F.3d 66 (2d Cir. 2004)] and *Auerbach* [*v. Bd. Of Educ. of the Harborfields Cent. Sch. Dist. of Greenlawn*, 136 F.3d 104 (2d Cir. 1998)] (*i.e.* the option to continue working after a certain age without loss of benefits) will never be conferred on the younger workers here. Again, because the older workers were offered a choice that the younger workers were not likewise offered – and presumably will never be – the older workers are in every respect better off than the younger workers, not worse.

(M&O at 11, 13.)

From there, the M&O noted the Supreme Court's holding in *Gen. Dynamics Land Sys. v. Cline*, 540 U.S. 581, 600 (2004), a case of reverse discrimination in which the Court held that

despite the ADEA's expansive prohibition against "discrimination . . . because of such individual's age," the purpose and history of the Act, among other things, did not bar employers from "favoring an older employee over a younger one," *Id.* at 600. Therefore, the M&O continued, "to the extent that this facially neutral policy was at all motivated by age, because the policy itself actually advantages the older workers, defendants did not violate the ADEA." (M&O at 15.)

### b. The Standard of Review on a Motion for Reconsideration

The decision to grant or deny a motion for reconsideration lies squarely within the discretion of the district court. *See Devlin v. Transp. Comm'ns Union*, 175 F.3d 121, 132 (2d Cir. 1999). The standard for a motion for reconsideration "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or [factual] data that the court overlooked — matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995); *see also Arum v. Miller*, 304 F. Supp. 2d 344, 347 (E.D.N.Y. 2003) ("To grant such a motion the Court must find that it overlooked matters or controlling decisions which, if considered by the Court, would have mandated a different result.") (citation and internal quotation marks omitted). "The major grounds justifying reconsideration are 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (quoting 18 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 4478 at 790). Thus, a "'party may not advance new facts, issues, or arguments not previously presented to the Court.'" *Nat'l Union Fire Ins. Co. v. Stroh Cos.*, 265 F.3d 97, 115 (2d Cir. 2001) (quoting *Polsby v. St. Martin's Press*, No. 97 Civ. 690(MBM), 2000 U.S. Dist. LEXIS 596, at *2

5

(S.D.N.Y. Jan. 18, 2000)).

### c. Plaintiffs' Motion for Reconsideration

Plaintiffs argue that the Court overlooked five factual matters in the M&O, properly pled in their amended complaint, that preclude a dismissal of their ADEA claim. Each of the five factual matters is address in turn below.

#### 1. *Comments in Newsday*

The first factual matter pertains to allegations that defendants admitted that the policy "targeted older employees." (Plaintiffs' Motion for Reconsideration ("Rec. Mot.") at 3.) Specifically, in a March 16, 2009 Newsday article, the County's Labor Relations Director, Daniel McCray ("McCray"), allegedly stated that the "pay caps are intended to prod the older . . . officers to retire . . . [and] allow the county to hire younger officers at lower salaries." (*Id.* (quoting Am. Compl. ¶ 51).) According to plaintiffs, the fact that defendants admitted they "targeted" older employees "supports" a claim for intentional discrimination under the ADEA, and "supports" a claim that the policy had a disparate impact on older employees, "irrespective of whether the policy was facially neutral." (*Id.* at 5.)

This argument is not incorrect. Such facts would indeed "support" an otherwise viable claim for both disparate treatment and disparate impact under the Act. However, these facts alone are by no means dispositive or sufficient to state a claim. Moreover, the M&O did not "overlook" the effect of these alleged statements. As the Court stated in its conclusion, "to the extent that this facially neutral policy was at all motivated by age, because the policy itself actually advantages the older workers, defendants did not violate the ADEA." (M&O at 15.) In other words, assuming *arguendo* that defendants in fact "targeted" the older workers, they did

not, according to the pleading, target them in a way that placed them at a disadvantage vis-à-vis their younger counterparts. Thus, the alleged "targeting," as plaintiffs refer to it, was not discriminatory under the Act. McCray's words in the Newsday article would have "supported" plaintiffs' claims had the policy imposed a relative disadvantage on the older workers. But as the M&O explained, it did not.

Finally, plaintiffs suggest in their reply memorandum that McCray's comments were "evidence that age was the 'trigger' motivating the Defendants' implementation of the new policy." (Reply Memorandum of Law in Support of Plaintiffs' Motion for Reconsideration ("Reply") at 1.) This argument, however, erroneously conflates the meaning of the word "trigger" as it is used in the M&O, with the defendants' alleged motivation behind the policy. The M&O never discussed whether age acted as a "trigger motivating the Defendants" but whether age acted as a trigger for the application of the policy. Specifically, the M&O distinguished the instant case from other cases in which "age – and not years of service – is the effective trigger" for the denial of benefits. (*See* M&O at 12 (quoting *Abrahamson*, 374 F.3d at 73).) The present case, the M&O explained, was different from these other cases in that the policy here was age-neutral, and therefore age did not "trigger" the imposition of the policy. The policy's "trigger" and defendants' motivation are two entirely different issues, as a close reading of the M&O and of this Order demonstrates. And, as stated above, the latter is not alone dispositive of plaintiffs' claims.[5]

---

[5] In fact, as plaintiffs point out in their reply, "if age 'played a role in the [employer's decision-making] process *and* had a determinative influence on the outcome,' then a disparate treatment case exists." (Reply at 1(quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1973)(emphasis added).) The operative word in that quote, at least for present purposes is "and." As discussed in the M&O, the policy was neither discriminatory on its face, nor was age a "determinative influence on the outcome." Plaintiffs' accompanying argument that years of

2. *Prior "Complaints" to County Officials*

The second factual matter involves "complaints" that plaintiff Richard Fogelson allegedly made to then-Nassau County Executive Thomas Suozzi and to McCray which "stated that the termination pay cap policy violated the [ADEA]." (Recon. Mot. at 4.) Other unspecified "complaints" were apparently made to the County's "EEO Trainer Tara Cominsky." (*Id.*) The Plaintiffs provide no explanation as to the practical or legal effect of these events, except to suggest that defendants "were made aware by Plaintiffs and other employees of the discriminatory nature of the termination pay policy." (*Id.*) The Court credits that these complainants may honestly have felt that they had been aggrieved or even discriminated against by the policy. Nevertheless, Court is at a complete loss as to why these statements—which, notably, were not made by defendants, but directed at them—would have any bearing whatsoever on whether defendants' policy was actually discriminatory as a matter of law.

Plaintiffs' argue in their reply that this "notice" to defendants satisfies the requirement that their allegations be "facially plausible and give [] fair notice to defendants of the bases of their claims." (Reply at 2 (quoting *Bell Atl. Corp. v. Twombly*, 55 U.S. 544 (2007).) However, as the M&O explained, plaintiffs' claims fail as a matter of law, and are therefore not "plausible." The issue of "notice" is therefore rendered academic.

3. 4. & 5. *Plaintiffs' Losses*

The third, fourth, and fifth factual matters that the Court purportedly overlooked focus on the differing effect the policy had on the two groups of plaintiffs that joined in this action, *viz.*, those who chose to retire before July 1, 2009, and those that did not. The alleged impact of the

---

service served as a "proxy" for age (*see* Reply at 2) is addressed below.

8

policy on each of these two groups can be summarized as follows.

With regard to the plaintiffs in the first group, these individuals chose retirement in order to avoid foregoing between $60,000 and $100,000 each. Faced with the prospect of such a loss, these workers claim they were effectively "forced [] to retire, thereby constituting constructive discharge." (*Id.* at 4.) They further argue that although they may have retained their full termination pay by retiring, they nevertheless lost out on the "additional years of income, pension, and other benefits" that would have come through staying on the job. Plaintiffs belonging to the second group, or those who chose not to retire, allegedly lost termination pay benefits valued between $41,000 and $100,000 each.

Plaintiffs suggest in their motion for reconsideration that the impact of the policy, as outlined above, illustrates why the "older employees were not advantaged at all by the termination pay policy over their younger counterparts." (*Id.* at 5.) Plaintiffs offer the following articulation of their argument:

> While any employee could choose to retire before July 1, 2009 if they were eligible to take advantage of the uncapped termination pay policy, because termination pay was calculated under the prior policy based on the years of service, the older employees who accumulated more years of service invariably stood to lose more by not retiring by July 1, 2009. In comparison, younger employees who accumulated less years of service invariably had less to lose because they accumulated less earned benefits.

(Recon. Mot. at 5.)

This argument is neither correct, nor was it overlooked in the M&O. As the plaintiffs concede, the amount of "termination pay was calculated under the prior policy based on the years of service." Therefore, years of service—or more specifically, the number leave days saved and accrued during these years of service—serves as the basis for calculating one's termination pay,

9

not one's age. Plaintiffs' argument ignores this age-neutral method of calculation by suggesting that older workers necessarily had more years of service than younger ones. Plaintiffs fail to explain why this would necessarily be the case. Furthermore, the Court addressed this very same fallacy in a footnote to the M&O that reads as follows:

> Although it is not central to their claim, plaintiffs also appear to suggest that the older workers were disparately affected in that they had accumulated more accrual days than younger workers. As alleged in the amended complaint, "[t]he older an employee is, all things being equal, the larger their bank of days becomes." (Am. Compl. ¶ 28.) Based on the facts alleged in the pleading, however, this assertion is simply not true. If all things are indeed equal, in other words, if two employees had given equal years of service and taken an equal amount of accrued days over the course of these years, then they would have the same number of days banked towards their termination pay. Any difference in the two employees' ages would have no bearing in this regard. Therefore, to the extent that plaintiffs are basing an age-related claim on this allegation, such a claim is also dismissed.[6]

(M&O at 15, n.7.)

But even if we were to assume that in every instance, age was somehow directly proportional to the amount of leave one had accumulated, *i.e.* suppose that that every worker entered the force at the exact same age, chose to take the exact same number of days off each year, and accumulated the same amount of leave time annually, the older workers would still not be at a disadvantage. Why? Because the policy affects each worker not when the policy goes into effect, but when that worker retires. For that reason, to evaluate whether the policy

---

[6] This same rationale can be applied to plaintiffs' argument that "Defendants[] targeted older employees who invariably had more years of service and more accrued days. Thus, years of service were a perfect proxy for Defendants to target older employees." (Reply at 2.) As the above excerpt from the M&O demonstrates, there is no basis for assuming that older workers "invariably had more years of service and more accrued days" than younger workers. Therefore, in this instance, a policy based on years of service does not serve as a proxy for age.

10

disadvantages the older workers vis-à-vis the younger workers, one would look at the relative effect on the older and younger groups of workers at the time they choose to retire. Working from the assumptions outlined above, and looking at the policy's impact at the time of retirement, the older workers are not placed at a disadvantage, regardless of whether they chose to retire before or after July 1, 2009. The following comparisons illustrate the rationale for such a conclusion.

First, in comparing the younger workers and the older workers who chose *not* to retire, we see that the two groups are ultimately impacted equally by the policy. More specifically, both sets of workers will receive no more than two times their final salary when they retire. Plaintiffs would, nevertheless, disagree with this assessment, choosing to focus instead on what they allegedly lost by not retiring, *i.e.* between $41,000 and $100,000 in termination pay benefits. But this view creates a false comparison between the younger and older workers because these purported "losses" actually represent benefits that the younger workers never had, and, so far as the current policy at issue is concerned, never will. The benefits that these plaintiffs point to are only benefits to the extent that they timely exercise their options and retire before the new policy takes effect. Therefore, the actual effect of the new policy is to place the older workers who chose not to retire and the younger workers on equal footing when they do retire. The older workers here are in no way worse off than their younger counterparts.

Second, in comparing the younger workers and the older workers who *did* chose to retire, it is clear that the older workers are decidedly better off. Although plaintiffs insist in their motion that they "were <u>not</u> offered a choice of benefits or any incentive which was unavailable to younger employees," (Ps' Mot. at 1 (emphasis in original)), the allegations suggest otherwise. The older workers retiring before July 1, 2009 are paid the full amount of their accrued leave,

11

whereas the younger workers never will be. Plaintiffs, however, disagree with this assessment as well, arguing instead that they would have continued working had it not been for the loss in termination pay. They suggest that by forcing this potential loss upon them, defendants subjected them to constructive discharge.

There are two fundamental problems with this argument. One, these alleged acts do not rise to the level of constructive discharge, which requires "working conditions so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004). If the policy indeed created conditions that would have compelled a reasonable person in the same position to retire, then clearly their fellow plaintiffs would not have chosen to stay on the job. Two, as explained above, the purported losses to the older retiring workers actually refer to benefits that the younger workers never had, and never will have. In that sense, the older workers are not worse off than the younger workers.

Plaintiffs nevertheless look at it a different way. They argue that the difference between the two groups lies not just in the effect of the policy at the time of retirement, but in the expectation that they harbored throughout their career that they would be rewarded for not taking leave time that they were entitled to as employees. On this point, plaintiffs note in their reply that "employees under 40 could manage their accrued days so that they could use them and not lose them [before they reach the termination pay cap]. . . . [T]hey would have the advance notice of the cap and the ability to manage their use of the accrued days . . . ." (Reply at 5.) But in reality, the younger workers had no more "notice" of the policy than the older workers. Prior to the announcement of the new policy, all workers, both young and old, held the same expectation that any time not taken would later be rewarded in the form of termination pay. In the case of the younger workers, they could theoretically have carried such expectations for as long as 17

12

years. It makes no difference whether an employee had accumulated more than or less than two years' worth of leave time before the new policy was announced. As long as one expected his or her termination pay to accumulate without limit, an incentive existed to bank leave time rather than take that time off. True, the longer one has worked for the force, the longer they held such expectations. But that is a product of their years of service, not their age.

The crux of plaintiffs' argument is that they suffered injury by having to make a "devil's choice" between retiring and losing additional years of income and pension, and remaining on the job and losing years of termination pay benefits. They suggest that "there was no advantage to either path when both paths caused loss of substantial income and/or benefits." (Recon. Mot. at 5.) But what plaintiffs seem to fail to have grasped from the Court's prior decision is that it does not matter that "there was no advantage to either path." Indeed, the Court recognizes that the policy forced these workers to make very tough decisions when it came to the new policy. Rather, what matters is that plaintiffs were at an advantage by virtue of the fact that they actually had two paths to choose from in the first place. The younger workers only had one: a mandatory termination pay cap when they eventually do retire, placing them in no better a position than any of the older workers, regardless of what "path" the older workers ultimately chose to walk.

### d. Conclusion

The purportedly "overlooked" factual matters were all considered and encompassed in the prior M&O. The Court affirms its holding precisely for the reasons stated in the M&O and denies plaintiffs' motion to reconsider that decision.

## II. PLAINTIFFS' MOTION TO AMEND THE COMPLAINT

### a. Standard of Review

Under Rule 15(a), the Court "should freely give leave [to amend a pleading] when justice so requires." Fed. R. Civ. P. 15(a); *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725 (2d Cir. 2010). However, a district court may deny a motion to amend where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). "The standard for futility with respect to a motion to amend under Rule 15 is identical to the standard for a Rule 12 (b)(6) motion to dismiss - namely, the court must determine whether the allegations in the complaint state a claim upon which relief can be granted." *Amna v. New York State Dep't of Health*, 2009 U.S. Dist. LEXIS 127139, *4 (E.D.N.Y. Sept. 3, 2009)(citation omitted).

To survive a motion to dismiss [under 12(b)(6)], a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

### b. Plaintiffs' Proposed Second Amended Complaint

The proposed second amended complaint includes a fundamental component that was missing in the amended complaint, *viz.*, an explanation of why the policy affects employees under 40 years of age differently than those aged 40 and older. According to the proposed second amended complaint ("SAC"), (1) two year's salary is equivalent to 522 working days, (2) officers begin their service with the Nassau County Police Department ("NCPD") only after they

14

turn 21 years of age, and (3) under the NCPD's leave policy, a 39-year-old officer, who could not have been on the force for more than 18 years, could only have accumulated a total of 475 accrued and unused leave days. (Ps' Mot. at 8.) By comparison, only those 40 years of age or older could have banked more than 522 days of leave time. Therefore, according to plaintiffs, a policy that caps one's termination pay to two times his or her final salary would not affect those who had not accumulated two years of leave time anyway, *i.e.* those under 40.[7]

The prior pleading did not provide any of this information, and the Court therefore assumed that 40 years of age represented the first time that an NCPD employee could elect to retire. The SAC now clarifies this point. Had this omission been the only infirmity in the earlier complaint, then plaintiffs' claims could now advance to the next stage of litigation. But plaintiffs' latest pleading still suffers from the same fundamental flaw that was present in the amended complaint, *viz.*, that the older workers were not actually disadvantaged relative to the younger workers.

The weakness in plaintiffs' claim as alleged in the SAC, is that it considers the effect of the policy during the period *before* the policy went into effect on July 1, 2009. At that point, those workers eligible for retirement had to decide whether they would continue to work beyond the effective date or retire. And at that point, those under the age of 40, who would not have accumulated more than 522 sick days anyway, were not affected. But, as discussed above, the real impact of the policy occurs on the date that an individual employee retires. Although the policy would not have made any difference to these younger workers on or before the day the

---

[7] Plaintiffs calculations actually demonstrate that one would only exceed the 522-day mark at the earliest after they turn 42 (*i.e.* after 21 years on the force). The pleading, however, alleges that the addition of various "suggestion" days such as Martin Luther King Day, award days, and blood-donation days could theoretically bring one over the 522-day threshold as early as age 40. (SAC ¶¶ 21, 38.)

15

policy went into effect, it would nevertheless have a direct bearing on their termination pay once they do pass the 522-day threshold.

Therefore, when we look at the impact of the policy on each employee at the time of retirement, the older workers who chose not to retire before July 1, 2009 will have the same cap imposed at the same level as the younger workers. Whereas, the older workers who retired before July 1, 2009, were eligible to receive proportionally higher termination pay than anyone else. In neither case, however, are the older workers at a disadvantage relative to the younger workers. The result is that plaintiffs cannot prevail under the ADEA, whether pursuant to a theory of disparate treatment or disparate impact.

Plaintiffs' motion to amend the complaint is therefore denied as futile.

### III. CONCLUSION

Accordingly, plaintiffs' motion for reconsideration and to amend is denied, and plaintiffs' federal claims are dismissed with prejudice. As discussed in the M&O, the Court declines to exercise supplemental jurisdiction over plaintiffs' state law claims. The Clerk of Court shall therefore close this case.

SO ORDERED.

Dated: Central Islip, New York
      February 9, 2012

/s/
Denis R. Hurley
United States District Judge

16